RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0236p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DAWN CRAWFORD, in her capacity as Administratrix
of the Estate of Marc Crawford,

*Plaintiff-Appellee*,

*v.*

No. 20-6391

JOHN TILLEY, individually and in his official capacity
as Secretary of the Justice & Public Safety Cabinet, et
al.,

*Defendants*,

JAMES ERWIN, individually,

*Defendant-Appellant*.

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:18-cv-00623—Claria Horn Boom, District Judge.

Argued: July 29, 2021

Decided and Filed: October 8, 2021

Before: GRIFFIN, LARSEN, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Brett R. Nolan, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant. Jessica K. Winters, THE WINTERS LAW GROUP LLC, Lexington, Kentucky, for Appellee. **ON BRIEF:** Brett R. Nolan, Heather L. Becker, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant. Jessica K. Winters, THE WINTERS LAW GROUP LLC, Lexington, Kentucky, for Appellee.

---

**OPINION**

---

NALBANDIAN, Circuit Judge. Marc Crawford died in Kentucky's prisons less than a month after police arrested him. His widow, Dawn Crawford, sued under 42 U.S.C. § 1983 on behalf of his estate. She claims multiple state officials and private companies failed to provide Marc with medical treatment while he was in their care.

This appeal is not about the state officials and private companies that directly rendered (or did not render) medical care for Marc while he was in state custody. Instead, it is about defendant James Erwin, then Kentucky's Acting Commissioner of the Department of Corrections. Dawn's complaint asserted, under a theory of supervisory liability, that Erwin violated Marc's Eighth Amendment[1] right to be free from "cruel and unusual punishments." Erwin moved to dismiss the claim, asserting qualified immunity. Dawn then amended her complaint, and Erwin filed an updated motion to dismiss. The district court rejected Erwin's qualified immunity defense and denied his motion. Erwin appealed. We **REVERSE** and **REMAND** the case with instructions that the district court dismiss the claims against Erwin.

**I.**

Kentucky police arrested Marc on May 25, 2017 and took him to the Madison County Detention Center ("MCDC"). Dawn witnessed his arrest. She told the police that her husband had lung cancer and would thus need immediate medical attention. Marc's medical records also stated that he had a blood clot in his left leg.

Kentucky contracts with private companies to provide its inmates with healthcare. Dawn names two of these companies, Southern Health Partners, Inc. and Correct Care Solutions LLC, as defendants. Both were responsible for Marc's medical care while he was in custody. According to Dawn, the companies offer constitutionally inadequate healthcare, in part because

---

[1]On the face of the amended complaint, it is not clear that Marc had ever been convicted of a crime. Thus, he may have been a pretrial detainee rather than a convicted prisoner. But Plaintiff has pleaded and argued this case solely under the Eighth Amendment standard, so we will apply that.

licensed practical nurses, rather than doctors or more experienced nurses, provide much of the care. She specifically alleges that Marc's intake screening and later assessments were inadequate.

The medical staff at MCDC provided Marc with minimal care. They removed his pain-medication patch, placed him on "inappropriate" psychoactive medications, and failed to provide him with his prescriptions. (R. 44, Am. Compl., PageID 417.) Correct Care refused to honor Marc's scheduled chemotherapy appointments while he was in custody. MCDC staff failed to treat Marc even on occasions when he was vomiting blood. One of the people taking care of Marc twice tried to get him further medical attention, but more senior staff refused.

Eventually, Marc was transferred to Kentucky State Reformatory ("KSR") on May 31, 2017. This was done to provide him with better healthcare. He arrived with an elevated heart rate, difficulty breathing, and swelling in his leg. A nurse practitioner prescribed him breathing treatments.

Marc's attorney called KSR after the transfer to check on him. A Correct Care employee assured the lawyer that Marc "would continue to receive all prescribed medications" and someone would alert Marc's family if his condition deteriorated. (*Id.* at PageID 421.) But despite Marc's complaints of pain, healthcare workers withheld his prescribed medication, breathing treatments, and chemotherapy.

Marc passed away on June 24, 2017, less than a month after his arrest and before prison staff could arrange for him to see an oncologist. Nobody contacted his family until June 26. The autopsy revealed that Marc effectively drowned with more than three liters of fluid accumulating in his lungs. Medical staff would have discovered this fluid if they had administered his prescribed breathing treatments.

More than two years after Marc's death, CNN published a report critical of Correct Care. The news outlet reviewed hundreds of lawsuits against the company and interviewed dozens of current and former employees. The lawsuits attributed more than seventy deaths to Correct Care. And doctors who studied a subset of those cases contended that "proper care" could have

prevented about half of the deaths they examined. (*Id.* at PageID 415.)  The amended complaint does not place any of those lawsuits in Kentucky, let alone at KSR.

During Marc's detention, James Erwin was the Acting Commissioner of the Kentucky Department of Corrections.  The Department manages Kentucky's penal, reform, and correctional institutions.  Ky. Rev. Stat. § 196.030.  It houses twenty-seven subdivisions, some of which are prisons, and each of which has its own internal hierarchy.  *See id.* § 196.026.  Beneath the Commissioner, a warden is directly responsible for the management of each institution, including KSR.  *Id.* § 196.180.

Dawn's amended complaint alleges a theory of supervisory liability against Erwin for the deprivations of Marc's constitutional rights.  But it attributes limited activity to Erwin.  Dawn alleges only that Erwin "accepted" Marc's transfer into KSR and that Erwin "would have been made aware of [Marc's] medical conditions" at that time.  (R. 44, Am. Compl., PageID 424.)  This meant, per Dawn, that Erwin had "direct involvement in the constitutional violations at issue." (*Id.* at PageID 427.)  Less directly, she alleges that he promulgated and maintained some of KSR's allegedly unconstitutional policies and customs.

At the same time, Dawn attributes significant knowledge to Erwin.  She alleges that Erwin was "specifically aware that Correct Care" had a pattern of failing to "provide inmates with adequate medical and mental health care." (*Id.* at PageID 412.)  And yet he did nothing in response to their "over-reliance on [licensed practical nurses]." (*Id.* at PageID 411; *see id.* at PageID 428.)  Erwin's knowledge allegedly came from three sources: ongoing litigation against prisoners and the estates of deceased prisoners, "critical investigations," and "the obviousness of the problems." (*Id.* at PageID 411, 425, 428.)

This appeal is about Erwin's qualified immunity.  That issue turns on whether Dawn "plead[ed] factual matter that, if taken as true, states a claim that [Erwin] deprived [Marc] of his clearly established constitutional rights." *Ashcroft v. Iqbal*, 556 U.S. 662, 666 (2009).  So we must decide whether the acts and omissions attributed to Erwin in the amended complaint show his supervisory liability under clearly established precedent.

But this case also arrives with a strange procedural history, which Dawn argues deprives us of our jurisdiction. We address this jurisdictional argument first.

## II.

Erwin's argument in favor of our jurisdiction is straightforward. Dawn filed her amended complaint on June 22, 2020. Erwin moved to dismiss, in part, based on qualified immunity. On November 25, 2020, the district court granted that motion in part, but denied it as to the Eighth Amendment claim on appeal. Erwin timely filed his notice of appeal two weeks later, on December 9, 2020. So his appeal is timely, and we have jurisdiction to resolve it.

Dawn's argument to the contrary focuses on filings related to her original complaint, which she filed on November 26, 2018. Erwin moved to dismiss based on qualified immunity. But before the district court decided Erwin's motion, Dawn moved to amend her complaint. Her motion included a draft of her tendered amended complaint. Erwin opposed that motion, arguing that the tendered amended complaint would be futile and prejudicial because it was untimely. The district court rejected Erwin's argument and granted Dawn's motion for leave to amend. In that same order, however, it also raised and rejected the qualified immunity argument that Erwin had made in response to the original complaint as though Erwin made a qualified immunity argument in response to Dawn's tendered amended complaint. The district court ultimately granted Dawn's motion to amend her complaint and denied as moot Erwin's motion to dismiss Dawn's original complaint. That order came down on June 8, 2020. Erwin did not appeal within the 30-day window allowed by 28 U.S.C. § 2107; *see also* Fed. R. App. P. 4(a).

Compliance with § 2107 is "mandatory and jurisdictional." *Bowles v. Russell*, 551 U.S. 205, 208–10 (2007). Rule 4(a) carries § 2107 into practice and provides that, subject to exceptions not applicable here, the notice of appeal "must be filed . . . within 30 days after entry of the judgment or order appealed from." Fed. R. App. P. 4(a); *see Bowles*, 551 U.S. at 209. Generally, the appeal comes from a district court's final decision. *See* 28 U.S.C. § 1291. And "a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a 'final decision' within the meaning of § 1291." *Iqbal*, 556 U.S. at 672.

Dawn argues that Erwin's failure to appeal the district court's earlier order prevents him from appealing the later order denying his motion to dismiss Dawn's amended complaint. (Appellee's Br. at 16–17.)  She is wrong for at least two reasons.

First, the district court adjudicated Erwin's later motion to dismiss on its merits and as an original matter.  The district court did not convert Erwin's second motion to dismiss into a motion for reconsideration, despite Dawn's suggestion to this effect.  Rather, the district court granted the 12(b)(6) motion on two of the three counts in the amended complaint, styling its order as "grant[ing] in part and deny[ing] in part" Erwin's motion.  (R. 65, Nov. 25, 2020 Op. & Order, PageID 649.)  As noted above, defendants can appeal the denial of a Rule 12(b)(6) motion raising qualified immunity.  *Iqbal*, 556 U.S. at 672.

Second, until Erwin pleaded qualified immunity in his motion to dismiss the amended complaint, he had not raised qualified immunity in response to that complaint.  "Once an amended pleading is interposed, the original pleading no longer performs any function in the case."  6 Arthur R. Miller, Mary Kay Kane & A. Benjamin Spencer, *Federal Practice & Procedure* § 1476 (3d ed. 2021).  The general rule is that filing an amended complaint moots pending motions to dismiss.  *See Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303–04 (2d Cir. 2020) (per curiam); *Ramirez v. County of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015); *Mandali v. Clark*, No. 2:13-cv-1210, 2014 WL 5089423, at *1 (S.D. Ohio Oct. 9, 2014).  Alternatively, district courts may exercise their discretion and apply a pending motion to dismiss to portions of an amended complaint that are "substantially identical to the original complaint." *See Mandali*, 2014 WL 5089423, at *2 (cleaned up); *see also Pettaway*, 955 F.3d at 303–04.[2]

But Dawn's tendered amended complaint substantially revised her original complaint. These revisions included new allegations against Erwin.  For example, the amended complaint alleges that Erwin accepted Marc into KSR, that he had constructive notice of Correct Care's

---

[2]In these cases, the trial court's decision to apply the pending motion to dismiss to the amended complaint inures to the defendant's benefit.  In effect, trial courts following this practice have determined that the new complaint failed to cure the defects identified by the motion to dismiss the original complaint.  That is not the situation here.

constitutionally inadequate practices, and that his inaction was a proximate cause of Marc's death. Nothing in the original complaint mounted similar allegations.

Undeterred by these discrepancies, the district court rejected Erwin's initial qualified immunity argument when it granted Dawn's motion for leave to file an amended complaint. This analysis pitted Dawn's tendered amended complaint against the defense Erwin prepared for her original complaint. He had not yet developed a qualified immunity argument responding to Dawn's new allegations. It is true that the district court ultimately found Erwin's updated qualified immunity argument wanting as well. But the district court's reasoned denial of Erwin's qualified immunity defense preserved the parties' arguments and its reasoning about the amended complaint for appeal. As Erwin explains, he timely appealed from this denial.

In sum, we reject Dawn's arguments. Erwin's appeal was timely. The district court granted in part and denied in part his motion to dismiss Dawn's amended complaint, and Erwin filed his notice of appeal two weeks later. That he didn't appeal the denial of his qualified immunity defense against Dawn's original complaint has no preclusive effect on his appeal from the denial of his later motion to dismiss. Indeed, that later motion to dismiss was necessary to tee up Erwin's operative qualified immunity argument for appeal. We have jurisdiction.

**III.**

We turn to the substance of Erwin's qualified immunity defense. Generally, "government officials are entitled to some form of immunity from suits for damages." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). So, "government officials" who "perform[] discretionary functions" receive qualified immunity, which protects them "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. It also protects them from the cost and burdens of suit, including discovery. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity thus balances "the need to hold public officials accountable when they exercise power irresponsibly" with "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Although a defendant ordinarily bears the burden of proof for an affirmative defense, a plaintiff bears the burden of overcoming qualified immunity. *See Mitchell*, 472 U.S. at 526. "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Id.* "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation mark omitted). We can address these requirements in either order. *Pearson*, 555 U.S. at 236. If one is lacking, we need not address the other. And here, Dawn has not pleaded a constitutional violation.

A.

The Eighth Amendment, as incorporated by the Fourteenth, forbids States from imposing "cruel and unusual punishments." U.S. Const. amend. VIII; *see Robinson v. California*, 370 U.S. 660, 666 (1962). "[T]he treatment a prisoner receives in prison . . . [is] subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). And so the Eighth Amendment imposes a duty on prison officials "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

1.

An Eighth Amendment claim of inadequate medical care has both an objective and a subjective component. *See Farmer*, 511 U.S. at 832–45. "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Id.* at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* Second, the official must have acted with "'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson*, 501 U.S. at 302-03). This is a "subjective" inquiry into the defendant's "state of mind." *See id.* at 838. "[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must

both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Putting that all together, "[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828.

2.

But here, that's not all. Dawn's Eighth Amendment claim against Erwin depends on Erwin's supervisory liability. So, on top of the deliberate indifference standard, Dawn's complaint must also meet the requirements of supervisory liability in § 1983 cases. Supervisory liability comprises two concepts important here: active involvement by the supervisor and causation.

Start with active involvement. "[T]o succeed on a supervisory liability claim, [a plaintiff] must show that 'a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.'" *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *see also Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) ("Plaintiff must show that the supervisors somehow encouraged or condoned the actions of their inferiors."); *Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) (encouragement satisfies this requirement). This "requires some 'active unconstitutional behavior' on the part of the supervisor." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). In short, a plaintiff must plausibly allege that a supervisory defendant "authorized, approved, or knowingly acquiesced in the unconstitutional conduct . . . of his subordinates through the execution of his job functions." *Id.* at 242.

But supervisory liability also has sharp limits. It will not attach for "a mere failure to act." *Id.* at 241. "[A] supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional right of another." *Id.*; *see also Winkler v. Madison County*, 893 F.3d 877, 898 (6th Cir. 2018) ("[L]iability cannot be imposed on a supervisor under § 1983 based on the theory of respondeat superior."). And supervisory liability requires more than negligence or recklessness. *Garza*, 972 F.3d at 866.

Active involvement isn't the only thing a plaintiff needs to show.  There also must be a "causal connection" between the defendant's "active unconstitutional behavior" and the plaintiff's injuries.  *Peatross*, 818 F.3d at 242; *see also* 42 U.S.C. § 1983 (extending liability to any state actor who "subjects, or causes [a person] to be subjected" to a violation of their constitutional rights).  In other words, the defendant's execution of his job functions must have caused the plaintiff's injury.  *See Peatross*, 818 F.3d at 242.  The challenged conduct must be both a cause in fact and a proximate cause of the alleged injury.  *Garza*, 972 F.3d at 868.  "Cause in fact is typically assessed using the 'but for' test, which requires us to imagine whether the harm would have occurred if the defendant had behaved other than he did."  *Id.* (quoting *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007)) (alteration removed).

On the other hand, "[p]roximate cause is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case."  *Crosby v. Twitter, Inc.*, 921 F.3d 617, 624 (6th Cir. 2019) (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008)) (cleaned up).  Proximate cause "'demand[s] . . . some direct relation between the injury asserted and the injurious conduct alleged.'"  *Id.* (quoting *Bridge*, 553 U.S. at 654) (cleaned up).  This ensures a "sufficient link between the defendant's conduct and the plaintiff's injuries."  *Id.* at 623 (citing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)).  In supervisory liability cases, we have drawn this line at the point where the supervisor's "active unconstitutional conduct" "could be reasonably expected to give rise to just the sort of injuries that occurred."  *Peatross*, 818 F.3d at 244 (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 790 (6th Cir. 2012)).

## B.

All that said, we turn next to the motion to dismiss.  We review the denial of a motion to dismiss on qualified immunity grounds de novo.  *Peatross*, 818 F.3d at 239–40.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[A] legal conclusion couched as a factual allegation" is not entitled to a presumption of truth.  *Id.* (quoting *Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing

*Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). We can draw upon our "judicial experience and common sense" to decide whether the claims are "plausible." *Id.* at 679. And any "complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

Our standard of review in these cases warrants more discussion. "There are two steps to our qualified-immunity inquiry" on appeal from denial of a motion to dismiss. *Buddenberg v. Weisdack*, 939 F.3d 732, 738 (6th Cir. 2019). We must "determine whether the facts alleged make out a violation of a constitutional right." *Id.* And also "ask whether the right at issue was clearly established when the event occurred so that a reasonable officer would have known that his conduct violated it." *Id.* We may answer these questions in any order. *Pearson*, 555 U.S. at 236.

Admittedly, we sometimes state that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *See, e.g.*, *Marvaso v. Sanchez*, 971 F.3d 599, 605–06 (6th Cir. 2020) (quoting *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015)); *In re Flint Water Cases*, 960 F.3d 303, 324 (6th Cir. 2020). And the district court here cited this proposition four times. But that general statement is at best imprecise. To be fair, most statements of this proposition are careful to explain that its application rests on qualified immunity's clearly established prong. *See, e.g.*, *Hart v. Hillsdale County*, 973 F.3d 627, 635 (6th Cir. 2020); *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019); *cf. Singleton v. Commonwealth of Kentucky*, 843 F.3d 238, 242–43 (6th Cir. 2016). And that's correct but the specificity of our opinions varies. So we clarify below.

It is true that courts, including ours, have suggested a basic incongruity between pleading requirements under Federal Rule of Civil Procedure 8, which require only that a plaintiff state a claim, and affirmative defenses, like qualified immunity. *See, e.g.*, *Siefert v. Hamilton County*, 951 F.3d 753, 761–62 (6th Cir. 2020); *Jacobs v. City of Chicago*, 215 F.3d 758, 774–75 (7th Cir. 2000) (Easterbrook, J., concurring). The idea is that a plaintiff is generally not required to negate

an affirmative defense in a complaint. *Jones v. Bock*, 549 U.S. 199, 212 (2007) (explaining that a plaintiff need not plead an affirmative defense in a complaint).

But as we have noted, the validity of such defenses may be apparent from the face of the complaint, rendering a motion to dismiss appropriate. *See Siefert*, 951 F.3d at 762. This is, after all, how we normally adjudicate other affirmative defenses on motions to dismiss. *See, e.g.*, *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (statute of limitations); *Parks v. Reans*, 510 F. App'x 414, 415 (6th Cir. 2003) (sovereign immunity); *Bd. of Trustees of Painesville Twp. v. City of Painesville, Ohio*, 200 F.3d 396, 398 (6th Cir. 1999) (subject matter jurisdiction). The larger point though is that this possible incongruity does not justify a special rule or presumption against granting motions to dismiss that applies specifically for qualified immunity. *Cf. Siefert*, 951 F.3d at 761 (calling this a "general preference").

Indeed, the Supreme Court has consistently stated that one of the goals of qualified immunity is not only to help defendants avoid unnecessary trials but also to allow defendants to avoid pre-trial discovery where the lawsuit is "insubstantial." *Harlow*, 457 U.S. at 808; *see also Mitchell*, 472 U.S. at 526; *Butz v. Economou*, 438 U.S. 478, 507 (1978). And for avoiding pretrial discovery, "a motion to dismiss is conclusive as to this right." *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996). Moreover, in *Harlow*, the Court reformulated the qualified immunity test by eliminating the subjective-good-faith requirement precisely because that requirement was permitting some qualified immunity cases to advance further than they should. 457 U.S. at 814–15; *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987) (the "driving force behind *Harlow*'s substantial reformulation of qualified-immunity principles" was that "insubstantial claims against government officials be resolved prior to discovery and on summary judgment if possible.") (quotation mark omitted).[3]

---

[3]To be sure, the Court, at times, contemplates that summary judgment may be used to resolve a dispute before pretrial discovery takes place—and that is technically permitted under Rule 56. *See* Fed. R. Civ. P. 56(b) ("[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery."). And perhaps that is a more viable option now than it was at the time of *Harlow* given the Court's later clarification of the summary judgment standard. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *see also Wyatt v. Cole*, 504 U.S. 158, 171 (1992) (Kennedy, J., concurring) (suggesting that *Harlow*'s reformulation of qualified immunity may have been unnecessary had *Celotex* been the summary judgment standard).

Finally, if there is a procedural incongruity here, the Supreme Court has not recognized it. Or, at least, the Court has not hesitated to affirm the dismissal of a lawsuit on qualified immunity grounds without mentioning any presumption against doing so. *See, e.g.*, *Iqbal*, 556 U.S. at 680–82 (plaintiff failed to plead unconstitutional actions); *Ashcroft v. al-Kidd*, 563 U.S. 731, 744 (2011) (law was not clearly established).

Now, what about applying the two-part inquiry itself: does either prong support a general preference to not grant motions to dismiss on qualified immunity? Here, it seems apparent, and consistent with our cases, that no such preference applies to the violation-of-a-constitutional-right prong. After all, asking whether there was a violation of a constitutional right resembles the Rule 12(b)(6) question—has the plaintiff pleaded facts that state a claim for relief in the complaint? More importantly, in *Iqbal* itself, which, along with *Twombly*, 550 U.S. 544, are the leading cases on Rule 12(b)(6), the Supreme Court affirmed the dismissal of the plaintiff's complaint on qualified immunity because it failed to establish a plausible claim. *See* 556 U.S. at 687 (reversing and remanding case because the "respondent's complaint fails to plead sufficient facts to state a claim" for a constitutional violation). And, as noted above, nowhere did the Supreme Court suggest that it was inappropriate to dismiss a complaint on qualified immunity or that there should be a presumption against it. If there were a presumption or preference against dismissing the case, we would expect the Court to at least acknowledge it.

---

But it's also true that federal court scheduling orders, like the one in this case, typically contemplate a summary judgment deadline that falls after discovery. And Rule 56(d) allows a party to argue that discovery is necessary in order to oppose summary judgment. Fed. R. Civ. P. 56(d). Not only that, but many federal judges do not favor multiple summary judgment motions—at least in some circumstances. *See, e.g.*, *Siemens Westinghouse Power Corp. v. Dick Corp.*, 219 F.R.D. 552, 554 (S.D.N.Y. 2004) (explaining that courts "do not approve in general the piecemeal consideration of successive motions for summary judgment because parties ought to . . . present their strongest case for summary judgment when the matter is first raised." (quotation marks and alteration removed)); *McCabe v. Bailey*, No. 05-CV-73, 2008 WL 1818527, at *2 (N.D. Iowa Apr. 4, 2008) (denying a renewed motion for summary judgment, which asserted qualified immunity, without considering the merits because the officials did not adhere to the court's trial management order) (citing *Torres v. Puerto Rico*, 485 F.3d 5, 10 (1st Cir. 2007) (holding that a district court can deny a defendant's dispositive motion, which asserts qualified immunity, if the defendants ignored the court's trial management order)); *Jackson v. Goord*, No. 06-CV-6172, 2013 WL 1560204, at *5 (W.D.N.Y. Apr. 10, 2013) (denying leave to file a second summary judgment motion because a defendant is not allowed to bring "a second or successive dispositive motion to correct deficiencies in the original motion."). So even though courts have the discretion to consider multiple summary judgment motions, a party might believe that moving for summary judgment before discovery is not a practical litigation strategy. For this reason, the Court has also regularly recognized that motions to dismiss are necessary to avoid pretrial discovery. And the modern formulation of the Rule 12(b)(6) standard, which post-dates the earliest Court statements about the avoidance of pretrial discovery, makes the motion to dismiss a more viable option now. *See Iqbal*, 556 U.S. at 678–79; *al-Kidd*, 563 U.S. at 741–42.

Common sense also proves the point. Imagine a conditions-of-confinement case identical to the one we face here. But—unlike Erwin—imagine that the hypothetical state defendant moved to dismiss under 12(b)(6) without raising qualified immunity. We would apply *Iqbal* to that motion. So it would be nonsensical, and even ironic, to enforce a presumption against dismissing the same complaint simply because the defendant has raised qualified immunity as an affirmative defense. In other words, § 1983 complaints are subject to the same federal rules as any other complaint. "No heightened pleading requirement applies to our review of a motion to dismiss based on qualified immunity." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (quotation marks omitted).

This reluctance to dismiss cases on qualified immunity might have more vitality in the clearly established context, which *Iqbal* did not cover. But even there, the inquiry is nuanced. Dismissing for qualified immunity on this ground is sometimes difficult because the clearly established inquiry may turn on case-specific details that must be fleshed out in discovery. *Seifert*, 951 F.3d at 761; *see also Guertin*, 912 F.3d at 917 (citing *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 234–35 (6th Cir. 2005) (Sutton, J., concurring)). And, although *Evans-Marshall* was in the context of a balancing test, which normally requires a fact-intensive inquiry, our caselaw has applied Judge Sutton's sentiment beyond the balancing analysis. *See Hart*, 973 F.3d at 635 (collecting cases). This is a natural development because the application of qualified immunity today can turn on minute factual distinctions. *See, e.g.*, *Latits v. Phillips*, 878 F.3d 541, 552–53 (6th Cir. 2017) (distinguishing the shooting of a suspect in a stopped car before an attempt to flee from the shooting a suspect in a stopped car after a police chase). Our taser cases are another example. *See Shanaberg v. Licking County*, 936 F.3d 453, 459 (6th Cir. 2019) (Nalbandian, J., concurring); *see also White v. Pauly*, 137 S.Ct. 548, 552 (2017) (per curiam) (requiring the identification of a case on point before qualified immunity can be denied).[4]

---

[4]To be sure, drawing fine factual distinctions in these cases has faced criticism but that is how we apply qualified immunity, so we leave that question to another day. *See, e.g.*, *Baxter v. Bracey*, 140 S.Ct. 1862, 1864 (2020) (Thomas, J., dissenting from denial of certiorari) ("There likely is no basis for the objective inquiry into clearly established law that our modern cases prescribe.").

At the same time, we are cognizant of the Supreme Court's admonition that we not let a plaintiff allege rights at such a high level of abstraction that his claim always survives. *See Anderson*, 483 U.S. at 640 n.2 ("A passably clever plaintiff would always be able to identify an abstract clearly established right that the defendant could be alleged to have violated"). According to the Court, it is a "longstanding principle that clearly established law should not be defined at a high level of generality." *White*, 137 S. Ct. at 552 (quotation marks omitted). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (quoting *Anderson*, 483 U.S. at 639). This is especially true under *Iqbal* and *Twombly*.

So a complaint distinguishable from our past cases on its face will not often survive a motion to dismiss on qualified immunity grounds. This is especially true where granting relief to the plaintiff can only be done by recognizing a novel constitutional right. In *al-Kidd*, for example, the Court affirmed the application of qualified immunity where it was apparent from the complaint that the law was not clearly established because "not a single judicial opinion" had held the official's action unconstitutional. 563 U.S. at 741; *see also Koch v. Dep't of Nat. Res., Div. of Wildlife*, No. 20-3334, 2021 WL 2221644, at *5, 7 (6th Cir. June 2, 2021) (affirming 12(b)(6) dismissal because plaintiff cited no case showing a "clearly established" constitutional violation).

Mindful of this instruction, we now consider the merits.

## IV.

Dawn's complaint, all told, must clear three hurdles. First, she must allege that someone Erwin oversees violated Marc's constitutional rights. Second, she must allege "active unconstitutional behavior" by Erwin. And third, she must allege that the "active unconstitutional behavior" was both a cause in fact and a proximate cause of the violation of Marc's rights.

Dawn has not carried this burden here. Her amended complaint fails both to allege any "active unconstitutional behavior" by Erwin and to explain how this behavior proximately caused Marc's injuries. Thus, Erwin is entitled to qualified immunity on the constitutional violation prong.

At most, Dawn's complaint alleges the following: Erwin accepted Marc's transfer to KSR.  Through that process, Erwin was "made aware" of Marc's medical conditions.  (R. 44, PageID 424.)  Erwin knew that Correct Care's deficient policies and customs posed risks to Marc.  Erwin never tried to alleviate these risks.  And the combination of these actions and inactions proximately caused Marc's injuries.  That's it.  Even charitably construed, this is all the activity that Dawn's amended complaint attributes to Erwin, and it is not enough to survive *Iqbal*.

Dawn's allegations that Erwin knew about Correct Care's practices at KSR are conclusory.  *See Iqbal*, 556 U.S. at 678.  Recall, Dawn alleged that Erwin knew about Correct Care's practices from ongoing lawsuits, critical reporting, and "the obviousness of the problem." (*Id.* at PageID 411, 425, 428.)  But the critical reporting she relies on does her no good.  CNN published the report she cites in her amended complaint on June 25, 2019.  Blake Ellis & Melanie Hicken, *'PLEASE HELP ME before it's too late'*, CNN (June 25, 2019), https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.  Marc passed away more than two years earlier.  So Erwin cannot have learned anything relevant to this amended complaint from that report.

Dawn's other claim that the problems at KSR were obvious to Erwin is also insufficient. In appropriate circumstances, we have attributed knowledge of obvious risks to prison officials. *Stoudemire v. Mich. Dep't of Corrs.*, 614 F. App'x 798, 803–05 (6th Cir. 2015) (citing *Farmer*, 511 U.S. at 842–43); *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (same).  But those defendants, both wardens, had day-to-day obligations at their institutions.  *See Stoudemire*, 614 F. App'x at 798; *Greene*, 361 F.3d at 292.  By contrast, Erwin is responsible for twenty-seven subdivisions within the Department of Corrections.  Ky. Rev. Stat. § 196.026.  At least twelve of these are penal institutions, each of which a warden directly manages.  *See id.* §§ 196.026, 196.180.  There is no allegation that Erwin regularly visited or received briefing on even some subset of them.  We've never attributed knowledge of prison conditions so high up the chain of command with so little in the way of alleged exposure to those same conditions.  So there are not enough well-pleaded factual allegations to establish that Erwin knew of particular issues related to Correct Care's practices at KSR.  *See Iqbal*, 556 U.S. at 664.

That leaves the ongoing lawsuits against Correct Care. The amended complaint provides no detail on where the alleged lawsuits came from. Rather, it observes that Correct Care was operating in more than five hundred institutions spread across thirty-four states. Erwin is never alleged to have read or had reason to know about any of the litigation; Dawn does not allege that any came from Kentucky generally or KSR specifically. So it is not plausible that Erwin knew about particular failures to provide adequate healthcare at KSR. *See Iqbal*, 556 U.S. at 678–79.

There is no suggestion in the amended complaint that Erwin might have learned about Marc or Marc's treatment by Correct Care any other way. There is no allegation he attends meetings or reviews reports about Correct Care's performance in Kentucky's prisons. Nor that he ever spoke to a Correct Care employee, or even to a third party about Correct Care. Nor that he reviews ongoing litigation against Correct Care (if, indeed, any of that litigation comes out of Kentucky). In short, there is nothing beyond the allegation that Erwin accepted Marc's transfer and was "made aware of [Marc's] medical conditions" at that time. (R. 44, Am. Compl., PageID 424.)

This is not enough to survive 12(b)(6) on an allegation of supervisory liability. Supervisory liability requires "active unconstitutional conduct" by Erwin. *See Peatross*, 818 F.3d at 241. But, as explained above, there are no well-pleaded factual allegations that Erwin knew anything besides that he was approving the transfer of a patient with lung cancer and blood clots to KSR to facilitate better medical treatment. *See Iqbal*, 556 U.S. at 679. Without more, Dawn has not pleaded that Erwin's acceptance of Marc's transfer implicitly authorized, approved, encouraged, or knowingly acquiesced in the alleged violation of Marc's constitutional rights. *See Peatross*, 818 F.3d at 242.

Dawn also has not pleaded that Erwin's acceptance of Marc's transfer was a proximate cause of his injuries. Supervisory liability is generally limited to times when the supervisor had existing knowledge of the specific type of conduct that led to a plaintiff's injuries. *See Garza*, 972 F.3d at 859–65 (teacher's physical abuse); *Peatross*, 818 F.3d 237–39 (police department's shootings); *Campbell*, 700 F.3d at 782–84, 790 (K-9 unit's dog bites). But the amended complaint does not describe the experience of any past inmates at KSR. And as explained above, the allegations about Erwin's knowledge of an existing problem are conclusory and not entitled

to a presumption of truth. *See Iqbal*, 556 U.S. at 681. Without more, Dawn has not pleaded that Erwin's acceptance of Marc's transfer proximately caused the alleged violation of Marc's constitutional rights.

**V.**

For the reasons above, we **REVERSE** the district court's denial of qualified immunity to Erwin, and **REMAND** with instructions to dismiss the amended complaint as to him.