RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0092p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

FELICIA QUIZEL MORGAN, by her next friend, Sha'Vonne Morgan,

　　　　　　*Plaintiff-Appellant/Cross-Appellee*,

　　*v.*

WAYNE COUNTY, MICHIGAN; SERGEANT ARELIA PENDERGRASS; DEPUTY LEONARD DAVIS; DEPUTY KEISA CLARK,

　　　　　　*Defendants-Appellees/Cross-Appellants*.

⎤
⎟
⎟
⎟
⎟
⎬  Nos. 21-1411/1450
⎟
⎟
⎟
⎟
⎦

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Port Huron.
No. 3:17-cv-12094—Robert H. Cleland, District Judge.

Argued:  March 9, 2022

Decided and Filed:  May 3, 2022

Before:  BATCHELDER, GIBBONS, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Michael R. Dezsi, LAW OFFICE OF MICHAEL R. DEZSI, PLLC, Royal Oak, Michigan, for Appellant/Cross-Appellee.  Davidde A. Stella, WAYNE COUNTY CORPORATION COUNSEL, Detroit, Michigan, for Appellees/Cross-Appellants.  **ON BRIEF:** Michael R. Dezsi, LAW OFFICE OF MICHAEL R. DEZSI, PLLC, Royal Oak, Michigan, for Appellant/Cross-Appellee.  Davidde A. Stella, WAYNE COUNTY CORPORATION COUNSEL, Detroit, Michigan, for Appellees/Cross-Appellants.

––––––––––––––––––

**OPINION**

––––––––––––––––––

GRIFFIN, Circuit Judge.

Plaintiff Felicia Morgan has long suffered from mental illness and has spent a large portion of her life incarcerated. While imprisoned, Morgan was temporarily moved to United Community Hospital (UCH), a private contractor that housed severely mentally ill inmates for Wayne County, Michigan. Three Wayne County deputies were scheduled to supervise the inmates in the UCH ward at all times. But on the afternoon of November 15, 2005, one deputy took his lunch break and a second left to use the restroom, leaving only one deputy in the unit. During those moments, there was a sexual encounter between Morgan and another inmate. After her release from prison, Morgan filed this lawsuit, alleging that the county and the on-duty deputies were deliberately indifferent to a serious risk of harm to her. The district court entered judgment in favor of defendants, and we affirm.

I.

In 2005, plaintiff Felicia Morgan was charged with assaulting a prison guard at the Scott Corrections Facility while serving a sentence for an unrelated conviction. She was transferred to the Wayne County Jail to await arraignment on the new charge.

At age 7, Morgan was diagnosed with Bipolar Disorder, ADHD, and depression, and Wayne County's records depict her as severely mentally ill. While incarcerated at Wayne County Jail, Morgan suffered from hallucinations, heard voices, and attempted suicide at least once. Furthermore, when Wayne County changed Morgan's medication, she began to "hallucinat[e] more intensively." Given her instability, Wayne County transferred Morgan to UCH, a private entity contracted by the county to provide mental health services to inmates. UCH changed Morgan's medication again, and she reported "blacking out" due to the changes.

The UCH ward had approximately six inmate bedrooms and a common area known as the dayroom. The inmate bedrooms were on the perimeter of the ward, with several larger rooms

used by staff in the center. UCH generally placed male inmates in bedrooms on one side and females on the other to separate them. At the relevant time, there were only two female inmates housed at UCH, one of whom was Morgan. The inmates' bedrooms did not have locks, but inmates were not allowed in other inmates' bedrooms.

The contract between UCH and Wayne County provided that Wayne County

> shall assign at least two uniformed Wayne County Sheriff's deputies to provide security 7 days per week, 24 hours per day inside the designated inpatient ward. The deputies shall monitor the facility for safety [and] security . . . but shall not be involved in providing or assisting in the provision of behavioral health services. Jail shall establish and communicate ward security procedures to [UCH].

Usually, three Wayne County deputies and two or three UCH employees were present in the ward. The deputies would position themselves as follows: one deputy would sit at the front desk, one deputy would sit in the dayroom to supervise that room and the adjacent hallway, and the third deputy would conduct rounds. Because of the dayroom's location, there were "blind spots" in the ward that the deputies were aware of. These blind spots were visible to an individual seated in the dayroom, but although UCH had installed mirrors to help monitor those blind spots, they were not visible from the front desk.

The deputies' bathroom was outside the ward. When a deputy left the ward (for lunch, to use the restroom, or otherwise), the other on-duty deputies would "relieve one another." There was no formal process for this, but it was "kind of already assumed" that when "one person leaves like that area, another person comes to replace them." Despite the blind spots, the unlocked bedroom doors, and the necessity that deputies leave the ward to use the restroom, there had never been a reported incident at UCH involving sexual activity between inmates before the incident giving rise to this case.

On November 15, 2005, Deputies Keisa Clark and Leonard Davis were staffing the unit, along with non-party Deputy Steven Hunter. Clark was covering the front desk, Hunter was stationed in the dayroom, and Davis was conducting rounds. Sergeant Arelia Pendergrass was the supervisor on duty, but she was not present at UCH, per the department's usual practice.

Around 5 p.m. that afternoon, Morgan asked UCH employee Glenn Williams to bring her more toilet paper. At this time, Davis had left the ward to use the restroom, and Hunter had left the ward for his lunch break. When Williams returned from the supply closet, he discovered that Morgan was not in the dayroom or her bedroom. He went looking for her and discovered her in the room of a male inmate, Eric Miles. Williams saw Miles on top of Morgan, the two apparently engaged in sexual intercourse. Williams perceived the two to be "comfortable having sex together," and when they saw him, they stood up and began to get dressed. Williams called for the deputies, but they did not arrive until after the inmates were already up and dressing. Deputies Clark and Davis separated Morgan and Miles. Deputy Clark interviewed Morgan, after which Morgan authored a statement saying that she took "responsibility for everything." Both Morgan and Miles declined to continue the investigation or pursue possible prosecution.

Morgan's deposition testimony (taken in 2019) is unclear, but she testified about two sexual encounters at UCH: one consensual and one nonconsensual. Morgan testified that once in the dayroom, she offered to have sex with another inmate. She also testified that on another occasion, she "woke up, he was on top of me having sex, muffling my sounds of please stop it with kisses, holding me down in the bed as I tried to struggle." She did not know who "he" was, but it wasn't until she "asked him to get up and stop, and that's when an officer came through the door, told him to get off me, and for me to get out of here and go to the desk." She recalled going to the hospital after this event, but she chose not to press charges because she "didn't know nothing happened in the room." And she has stated that she "wrote what he told me to write" as her statement.

Morgan was taken to the hospital after the incident, where she refused a rape kit because she "didn't want to be touched." She was later returned to the Scott Corrections Facility, where it became apparent that she was pregnant. After the incident at UCH, Morgan grew "isolative and paranoid," and "didn't believe [she] was pregnant." But on August 14, 2006, Morgan gave birth to a child, apparently fathered by Miles. Morgan remained incarcerated by the Michigan Department of Corrections until she was paroled in April 2017.

In 2017, Morgan filed the instant action through counsel, bringing federal and state law claims. Wayne County alone moved to dismiss the complaint on the grounds that the complaint was time-barred by the statute of limitations, that Morgan failed to state a viable municipal liability claim, and that the county was entitled to governmental immunity on the state law claims. The district court ruled that Morgan had pleaded enough facts to allow discovery on the statute of limitations issue and the municipal liability claim against the county but granted the county governmental immunity on the state law claims. After discovery, all defendants filed a motion for summary judgment on all counts. Although the court denied the motion on statute of limitations grounds, it granted the motion on the basis that Deputies Clark and Davis were entitled to qualified immunity, that the evidence did not support a claim of supervisory liability against Sergeant Pendergrass, and that Morgan's *Monell*[1] claims against Wayne County failed as a matter of law. Thus, although Morgan raised genuine issues of material fact regarding the tolling of the statute of limitations, there were no claims remaining to submit to a jury. Accordingly, the district court granted summary judgment in favor of defendants. Morgan timely appealed.[2] Defendants timely cross appealed the district court's statute-of-limitations decision.[3]

## II.

Morgan first claims that defendants Clark and Davis were deliberately indifferent to her constitutional rights by ignoring the substantial risk that other inmates would commit violence against her. The district court held that Clark and Davis were entitled to qualified immunity on this claim and granted summary judgment in their favor. We review that decision de novo. *Shanaberg v. Licking Cnty.*, 936 F.3d 453, 455 (6th Cir. 2019).

---

[1]*Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978).

[2]Morgan does not appeal the judgment in favor of Sergeant Pendergrass.

[3]We note that defendants did not need to file a cross-appeal to challenge this ruling, as the ruling provides an alternate ground to sustain the district court's judgment. *See Smith v. State of Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 436 (6th Cir. 2006); *Pace Int'l Union, AFL-CIO, CLC v. Vacumet Paper Metalizing Corp.*, 91 F. App'x 380, 382 (6th Cir. 2004).

Qualified immunity shields public officials from personal liability under 42 U.S.C. § 1983 unless they "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether defendants are entitled to qualified immunity, we must ask two questions: (1) "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted). We may consider these questions in either order. *Id.* at 236.

An inmate's right to be free from prison violence under the Eighth Amendment was clearly established at the time of defendants' alleged misconduct. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "Thus, the constitutional right to be free from deliberate indifference to assault and sexual abuse was clearly established at the time of the alleged constitutional violation." *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011).

To show that Clark and Davis violated this constitutional right, Morgan must show that "(1) the alleged mistreatment was objectively serious; and (2) [one or both] defendant[s] subjectively ignored the risk to [her] safety." *Id.* In this regard, we recently held that a pretrial detainee's right to be free from deliberate indifference arises from the Fourteenth Amendment, rather than the Eighth Amendment, which modifies or eliminates the showing a plaintiff must make on the subjective component. *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021); *see Trozzi v. Lake Cnty.*, 29 F.4th 745, 753 (6th Cir. 2022) (discussing *Brawner*'s "modified subjective standard"). *But see Westmoreland v. Butler Cnty.*, 29 F.4th 721, 728 (6th Cir. 2022) (noting that after *Brawner*, "our Circuit has explicitly taken the position that a failure-to-protect claim by a pretrial detainee requires *only* an objective showing that an individual defendant acted (or failed to act) deliberately or recklessly" (emphasis added)). At the time of the alleged assault, Morgan was both a pretrial detainee (on the assault of a prison officer charge) and a convicted prisoner (on the unrelated charge). However, she has pleaded and argued this case solely under the Eighth Amendment standard. We agree with Morgan that under these circumstances, the more demanding Eighth Amendment standard is applicable. *See, e.g., Crawford v. Tilley*, 15 F.4th 752, 756 n.1 (6th Cir. 2021).

The district court concluded that even if Morgan had met her burden on the objective component, she had not met it on the subjective component, so she had not demonstrated that her constitutional rights were violated. We agree. Like the district court, we assume for the purpose of this analysis that Morgan has met her burden on the objective component and begin with the subjective component.

To establish a constitutional violation based on failure to protect, Morgan must show that defendants acted with "deliberate indifference" to her safety. *Farmer*, 511 U.S. at 834. An official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. But an official who was unaware of a substantial risk may not be held liable under the Eighth Amendment, "even if the risk was obvious and a reasonable prison official would have noticed it." *Bishop*, 636 F.3d at 767. We must evaluate the liability of each deputy individually. *Id.* And it is Morgan's burden to demonstrate that defendants possessed a sufficiently culpable state of mind. *Griffith v. Franklin Cnty.*, 975 F.3d 554, 568 (6th Cir. 2020).

## A.

We start with Deputy Davis. Davis was aware of the physical layout of the unit and the security risks posed by that layout, including the co-ed housing, unlocked bedroom doors, and blind spots. Davis knew there had been no prior reported incidents of sexual contact among UCH inmates. He knew there were usually three deputies and three UCH staff members in the ward at any given time, and he knew that when a deputy would leave the ward for lunch, standard practice was to rearrange staff to accommodate that change. Davis testified that even when a deputy left for lunch, UCH staff members were always present in the day room: "there was always maybe one person left, there's two people on the unit," so the inmates were not left unsupervised. And he testified that on the date of the assault, "there was someone back there, so

it wasn't just like it was empty." At the time of the assault, he conducted a round and "then, it was just, you know, normal thing, so I went to the bathroom." And we note what Davis did not know: Morgan points to evidence that Miles had prior violent tendencies before being sent to UCH. But the record contains no evidence that Davis was aware of this information, beyond his general knowledge that prisons are dangerous places.

This record asks as many questions as it answers. We do not know how long Davis was in the restroom or if leaving the ward was a common practice of his, one that he had done before without incident. And perhaps most importantly, we do not know whether any of the inmates were aware that Davis was unable to supervise them when he went to the restroom. All the record shows is that there had not been any sexual contact between inmates before, and that Davis left the dayroom knowing that UCH staff members were present. Together, these facts demonstrate that Davis did not perceive his trip to the restroom as increasing or creating a risk to inmate safety, because the inmates were still supervised in some capacity. It is certainly possible to imagine a scenario where Davis went to the restroom, knowing he would be gone for fifteen to twenty minutes and knowing that he should alert Clark to his absence because of the increased risk of harm when inmates were left unsupervised, but deciding that his needs were more important than the inmates' safety. But that is a hypothetical scenario, unsupported by this record. Such a "metaphysical doubt" is insufficient to survive summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It is Morgan's burden to rebut the defense of qualified immunity. On this record, she has not done so because there is no evidence that demonstrates deliberate indifference on Davis's part.

B.

Turning to Deputy Clark, the record is unclear whether she knew that Davis was going to the restroom at the time he left, or if she discovered it later. Clark testified that on the day of the assault, "I was at the desk, and I believe Davis was – he went to the bathroom." That gap, combined with circumstantial evidence in the record, defeats Morgan's claim against Clark.

If Clark did not know that Davis left the unit when he did, she cannot be liable because she was unaware of the risk created when he left. *Farmer*, 511 U.S. at 841-42.

If Clark *did* know that Davis left the unit, she may be liable if she knew that his absence created a substantial risk to inmate harm, and she disregarded that risk. But as with Davis, the record does not allow for this inference. Clark testified that she knew that three deputies worked each shift at UCH, and she knew that the blind spots in the ward required a deputy to be stationed in the dayroom. She also acknowledged that while she was seated at the desk (as she was at the time of the alleged assault) she could not see the blind spots. She testified that because Hunter had left for lunch, she understood Davis to be covering the dayroom, but that the "hospital workers [were] just as responsible for kind of staffing that area, too." In short, Clark understood the dayroom to be adequately supervised.

Morgan argues that because Clark described Miles as being "sexually pre-occupied," Clark was aware of the substantial risk that Miles posed to other inmates. In context, however, Clark's description appears to reference only that Miles would "flirt" with females—not that he was a sexual predator or was at risk of sexually assaulting other inmates. And as with Davis, there is no evidence that Clark knew Miles to have violent tendencies. Thus, there is no evidence demonstrating that Clark understood her choice to remain seated at the front desk as deliberately placing inmates at a substantial risk of harm.

C.

Because Morgan has not met her burden on the subjective component of her claim, we need not evaluate the objective component. The district court properly granted summary judgment in favor of Deputies Clark and Davis.

III.

Next, Morgan brings a municipal liability claim against Wayne County. Such a claim requires her to demonstrate that the alleged federal violation occurred because of a municipal policy or custom. *Monell*, 436 U.S. at 694. A municipality may be held liable under one of four recognized theories: "(1) the existence of an illegal official policy or legislative enactment;

(2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Morgan rests this claim on two theories: (1) that Wayne County's policy of housing male and female inmates who suffered from severe mental illness together without adequate security precautions was an illegal policy and (2) that Wayne County failed to train and supervise its deputies regarding how to avoid creating an excessive risk of inmate-on-inmate violence.

### A.

To sustain an illegal policy or practice *Monell* claim, Morgan must show the existence of a policy, connect that policy to the municipality, and demonstrate that her injury was caused by the execution of that policy. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993). Because Morgan has not demonstrated that any individual employee violated her Eighth Amendment rights, she must show that the municipality itself, through its policy or practice, violated her Eighth Amendment rights by manifesting deliberate indifference to her vulnerabilities. *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 495-96 (6th Cir. 2008); *see also North v. Cuyahoga Cnty.*, 754 F. App'x 380, 391 (6th Cir. 2018). Standing alone, an allegation that a policy was violated cannot sustain a constitutional deliberate indifference claim. *Winkler v. Madison Cnty.*, 893 F.3d 877, 901 (6th Cir. 2018). Instead, Morgan must show that the policy itself was facially deficient. "An unconstitutional policy can include both implicit policies as well as a gap in expressed policies." *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016).

Morgan argues that Wayne County's policy had an unconstitutional gap because the lack of a policy separating male and female inmates created a security risk, which shows that Wayne County was deliberately indifferent to her vulnerabilities. But Wayne County has presented a comprehensive security protocol that addresses minimum staffing, rounds, reporting requirements, head counts, inspections, shower security, and other duties. This policy was a clear attempt to protect inmates. Indeed, there had been no reported instances of sexual relations or assaults between inmates at UCH before November 2005. And there exists no evidence that

prior to this incident, Wayne County knew its policy was ineffective. Morgan cites no authority for the proposition that the Eighth Amendment requires men and women to be housed separately, which, at bottom, is her argument. Accordingly, in this case, she cannot sustain a *Monell* claim against Wayne County.

B.

Morgan also argues that Wayne County failed to train and supervise its deputies to ensure the safety of mentally ill inmates. Inadequate training can be the basis for a *Monell* claim, but "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). There are two ways to support a claim that a failure to train or supervise is the result of a municipality's deliberate indifference. Morgan may prove (1) a "pattern of similar constitutional violations by untrained employees" or (2) "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738-39 (6th Cir. 2015) (citations and quotation marks omitted). Morgan has not presented proof of any previous sexual assaults at UCH, so the first method is unavailable to her. And she has not shown that any individual defendant violated her constitutional rights, so the second method is unavailable to her. Thus, Morgan's failure-to-train claim is untenable.

IV.

Finally, Morgan brings state law claims for negligence, gross negligence, and wrongful conception. Defendants filed a motion to dismiss these claims based on Michigan's Governmental Tort Liability Act (GTLA), M.C.L. § 691.1401 *et seq.*, which the district court properly granted.

The GTLA grants immunity from tort liability when an actor is "engaged in the exercise or discharge of a governmental function." § 691.1407. Morgan agrees that defendants are entitled to immunity under this statute unless an exception applies. Relevant here, the "medical care or treatment" exception provides as follows:

> This act does not grant immunity to a governmental agency or an employee or agent of a governmental agency with respect to providing medical care or treatment to a patient, except medical care or treatment provided to a patient in a hospital owned or operated by the department of community health or a hospital owned or operated by the department of corrections and except care or treatment provided by an uncompensated search and rescue operation medical assistant or tactical operation medical assistant.

§ 691.1407(4).

The district court concluded that when Morgan was assaulted, defendants were not providing medical care or treatment to her; rather, the assault occurred because of a "lapse in safety and security measures." Thus, the medical care or treatment exception to the GTLA did not apply, and defendants were entitled to governmental immunity. Morgan argues that this decision stands contrary to several decisions from the Michigan Court of Appeals and must be reversed. We disagree.

When applying state law, we must "anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court." *Vance v. Amazon.com*, 852 F.3d 601, 610 (6th Cir. 2017) (citation omitted). The Michigan Supreme Court has not directly addressed the medical care or treatment exception to the GTLA, so we must "render a prediction by looking to all the available data," including decisions of other Michigan courts. *Id.* (citation and quotation marks omitted). There are four relevant Michigan Court of Appeals decisions.

First, in *Briggs v. Oakland Cnty.*, 742 N.W.2d 136 (Mich. Ct. App. 2007), the court of appeals held that the medical care or treatment exception was clear and unambiguous, so its meaning could be discerned from its plain language. *Id.* at 138. Three years later, the court of appeals reiterated this in *McLean v. McElhaney*, 798 N.W.2d 29, 33-34 (Mich. Ct. App. 2010). There, the court also concluded that the language applied to mental health care as well as physical health care, but noted that for the exception to apply, the victim "must have also been defendants' 'patient.'" *Id.* at 35 (quoting § 691.1407(4)).

Then, in an unpublished and non-binding decision,[4] *In re Est. of Ball*, No. 314861, 2014 WL 4214871 (Mich. Ct. App. Aug. 26, 2014), the court of appeals concluded that that governmental immunity did not preclude claims against the Grand Rapids Home for Veterans (GRHV) when a patient was assaulted by another patient and died from his injuries. There, Andrew Ball, Jr., was admitted to GRHV due to his worsening Alzheimer's dementia. *Id.* at *1. He would frequently awake at night and wander throughout the home, at times leaving it entirely. *Id.* One night, he wandered into another room at GRHV, whose resident assaulted him. *Id.* Ball died four days later from medical complications of blunt force trauma to the head. *Id.* A divided panel of the court of appeals concluded that "immunity is waived when the claim arises from facts relating to medical care or treatment." *Id.* at *3. Ball had been admitted as a patient to receive care for his dementia, and his death was related to a symptom of dementia (wandering). *Id.* Thus, the court held that the exception to governmental immunity applied. *Id.*

The court of appeals considered another GRHV case in its unpublished decision *Est. of Falarski by Falarski v. Dep't of Mil. and Veterans Affairs*, No. 343494, 2019 WL 1211880 (Mich. Ct. App. Mar. 14, 2019). That patient, Joseph Falarski, also had Alzheimer's disease and he was at a high risk of falling. *Id.* at *1. Despite having a "fall care plan," he fell twice within three days and died from complications of the second fall. *Id.* The court applied *Ball* and concluded that the medical care or treatment exception did apply but noted that the word "patient" "implie[d] that the injury must arise in a medical context. And it certainly limits the class of plaintiffs to whom the exception applies." *Id.* at *2.

Morgan argues that the non-precedentially binding decisions of *Ball* and *Falarski* should dictate the outcome here: Morgan was housed at UCH only because of her mental illnesses, just like Ball and Falarski were housed at GRHV due to their Alzheimer's disease. Therefore, she argues, just like in *Ball* and *Falarski*, defendants cannot avail themselves of the medical care or treatment exception. But this argument misses the mark because *Ball* and *Falarski* involved claims against the entity providing medical care, of which the decedents were patients. In contrast, Morgan was not a "patient" of any defendant, because defendants did not provide

---

[4]Mich. Ct. R. 7.215(C)(1) provides that "[a]n unpublished opinion is not precedentially binding under the rule of stare decisis."

medical care or treatment.   Only UCH provided medical care—indeed, the contract between Wayne County and UCH provided that the county was "not [] involved in providing or assisting in the provision of behavioral health services."   Morgan was a patient of UCH and the medical providers employed there.   Defendants were providing security assistance, not medical care or treatment.   Accordingly, they do not fall within the medical care or treatment exception and are thus entitled to governmental immunity.

V.

For these reasons, we affirm the district court's judgment.**5**

---

**5**In view of our affirmance, it is unnecessary for us to consider the statute of limitations defense asserted by defendants.