NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0026n.06

No. 21-3396

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| DEBRA O'DONNELL, Individually and as Administratrix of the Estate of James Parsons, deceased, and SHERRY PARSONS, | ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) | **FILED** Jan 14, 2022 DEBORAH S. HUNT, Clerk |
| v. | ) ) ) | |
| G. MICHELE YEZZO, In her individual and official capacity; DANIEL CAPPY, In his individual and official capacity; JOHN LENHART, In his individual and official capacity; CHARLES MICHAEL WHITE, In his individual and official capacity; and CITY OF NORWALK, OHIO, | ) ) ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| Defendants-Appellees, | ) ) ) | |
| STATE OF OHIO and HURON COUNTY, OHIO COMMON PLEAS COURT, | ) ) ) | |
| Interested Parties-Appellees. | ) ) ) | |

BEFORE: McKEAGUE, GRIFFIN, and KETHLEDGE, Circuit Judges.

GRIFFIN, Circuit Judge.

Barbara Parsons was murdered in 1981 in Norwalk, Ohio. No charges were brought against anyone for her death until the 1990s, when defendant Michael White, a detective with the City of Norwalk police department, determined that Barbara's husband, James (Jim) Parsons, was likely responsible for her death. He reached this conclusion with the assistance of defendant G. Michele Yezzo, a mentally unstable evidence technician with the Ohio Bureau of Criminal

Investigations ("BCI") who had a reputation for "stretching the truth" to satisfy police. This crucial impeachment evidence about Yezzo was never disclosed to Jim Parsons's criminal defense team, and he was convicted of his wife's murder. Over twenty years later, and due to efforts from the Ohio Innocence Project, Mr. Parsons was granted a new trial in 2016. He passed away before he was retried.

His daughters, individually and on behalf of his estate, brought this lawsuit against defendants White, Yezzo, the City of Norwalk, and Yezzo's supervisors Dan Cappy and John Lenhart, alleging that defendants violated their father's rights during the investigation and prosecution. The district court dismissed some claims and granted summary judgment in favor of defendants on the remainder; it also denied plaintiffs' motion to amend the complaint and their repeated requests to compel grand jury materials. Plaintiffs now appeal. We affirm in part, reverse in part, vacate in part, and remand for further proceedings consistent with this opinion.

I.

A.

Barbara Parsons was found beaten to death in her bed in February 1981.[1] When he learned about his wife's death, Jim rushed home from the auto repair shop he owned. He fainted when he arrived, was taken to the hospital, and was questioned by Norwalk Police. Jim acknowledged that he was having marital problems with Barbara but denied knowing anything about her death and stated that he had been at work all day.

The coroner believed the murder weapon was a narrow instrument that was either octagonal, triangular, or square in shape on the end. The Norwalk Police Department's

---

[1]Because Barbara, Jim, and Sherry Parsons are involved in this case, we refer to them by their first names in this opinion to reduce confusion.

investigation uncovered three breaker bars (long non-ratcheting bars that are used with socket-wrench-style fasteners when a standard socket wrench will not do) that met this description, but only one of those breaker bars—the so-called "Burras bar"—is pertinent for our purposes.

Neil Burras was Jim's friend. Burras found a Craftsman breaker bar in the backseat of a vehicle he bought from Jim. How the bar came to be in the vehicle was questionable. Burras had purchased the car from Jim in January 1981 (before the murder) and cleaned it out; he later testified that there was no bar in the car when he did so. Shortly after Barbara's murder in February, Burras went to Arizona. In March 1981, Burras found a breaker bar in the car. Norwalk Police became aware of this bar through a mechanic at Jim's shop, who informed officers that Jim had oddly announced that a breaker bar was missing from a tool set, and that the bar had been left in a car sold to Burras before the murder. Norwalk Police reached out to Burras, asking if Jim had left a breaker bar in the vehicle. Burras turned over the bar at that time. The mechanic identified the Burras bar as the breaker bar missing from Jim's tool set. This breaker bar yielded no blood when tested by the FBI.

No charges were filed against James Parsons (or anyone else) for Barbara's murder as part of the initial investigation, and the case went cold.

## B.

Defendant Michael White joined the Norwalk Police Department's Detective Bureau in 1986. White learned about Barbara's unsolved murder and decided to renew the investigation. He began by reviewing photos of the blood-stained bedsheet, concluding that "somebody had hit something real hard and it bounced twice." This appeared to be a "bar mark" to him.

When White reviewed the physical evidence, he discovered that there was only one breaker bar in the evidence room. The whereabouts of the two other breaker bars that had been discovered

by the Norwalk police in their initial investigation are unclear. White identified the bar in the evidence room as the Burras bar because it was labeled with the initials of the officers who recovered the bar from Burras in 1981, as was the brown paper bag in which it was stored. White threw away the original brown paper bag that held the Burras bar because it had "deteriorated to the point where it was no longer usable." In White's estimation, the Burras bar matched the blood stains on the bedsheet based on the "bar marks."

White submitted the bedsheet and the Burras bar to the Cuyahoga County Coroner's Office for review. The Cuyahoga Coroner's Office found that the impressions on the bedsheet were consistent with a breaker bar but could not confirm or deny that the Burras bar was the specific murder weapon.

White sought a second opinion from Steven Hale, an investigator from Greene County, Ohio. Reviewing only the photos of the crime scene and autopsy (and not the physical evidence), Hale concluded that the "suspect identified in the investigation"—i.e., Jim—"is most likely the assailant," despite not identifying any physical evidence connecting the suspect to the murder or connecting the Burras bar to the murder.

White submitted the same evidence to the Connecticut State Crime Lab, with the aim of having Dr. Henry Lee, a "world renown[ed] specialist in blood spatter analysis," review the blood splatter on the bedsheet. However, Dr. Lee declined to review the evidence or "get involved" in the case.

Finally, White submitted the bedsheet and the Burras bar to the BCI for evaluation. Hale reached out to BCI Analyst G. Michele Yezzo on White's behalf because Yezzo was the BCI's blood-spatter expert at the time. The case was assigned to Yezzo directly, despite BCI's usual

random assignment process. Yezzo was concerned about White's "lab shopping," but she took White's word that the analysis she was hired to conduct had not been done by any other labs.

White recalls that Yezzo conducted an experiment in front of him: the bedsheet was spread out, Yezzo sprayed a "chemical enhancement" on it, and "hit the sheet with a black light." This allowed White to read "several letters from the word Craftsman" on the sheet. He also saw an "oval mark" on the sheet that matched the Burras bar, described as an "anomaly specific to that bar probably where it had been hit against something and created a slight indentation or a strike or a scratch or something on that bar." Yezzo did not attach photographs to her report, but her first written report notes that she saw an "N" and an oval mark on the bedsheet. In White's view, this "finally had linked the breaker bar to the . . . bed sheet."

## C.

Based at least in part on Yezzo's testimony about the breaker bar, a grand jury indicted James Parsons for Barbara's murder. Between the indictment and the jury trial, White resubmitted the bedsheet and the Burras bar to Yezzo. This time, Yezzo found both an "N" and an "S" on the bedsheet, along with "some individualizing characteristics," but again, she did not photograph any of her work.

Sometime thereafter, Yezzo was placed on administrative leave after making a threat to her coworkers about "going postal." The prosecutor's office informed White that Yezzo was on leave. Concerned that Yezzo would not be able to testify at trial, White contacted BCI to ensure she would testify. Despite the "consensus" among Yezzo's supervisors that she was suffering from some sort of "mental imbalance," she was allowed to return to work early so she could testify at Jim's trial. Her first day back was the day she testified.

At trial, the Burras bar was introduced into evidence as Exhibit 71. Burras himself testified that Exhibit 71 might not be the same bar that was recovered from his vehicle. Yezzo, however, testified that Exhibit 71 was the bar she tested, and that she found an "N" and an "S" on the bedsheet that matched that bar. The defense introduced three other breaker bars into evidence, arguing that they looked very similar to the Burras bar, so it was impossible to identify the Burras bar as the murder weapon, and in turn, impossible to pin the murder on Jim. The jury rejected this argument and convicted him. He was sentenced to fifteen years to life in prison.

D.

After exhausting a direct appeal and pursuing a habeas corpus petition, James Parsons contacted the Ohio Innocence Project (OIP). As part of that investigation, OIP obtained reports from two individuals that raised significant questions about the forensic evidence against Jim. And in 2015, the OIP obtained Yezzo's personnel file, which revealed that

> while at work in the B.C.I. Lab [Yezzo] experienced great difficulty in her relationships with others. Incidents involving her threats to kill others and herself, engaging in assaultive behavior toward co-workers, and contemptuous behavior toward her superiors are documented within the file. The Assistant Superintendent of B.C.I. found in 1989 that Ms. Yezzo's problems at work were affecting her overall performance and that "her findings and conclusions regarding evidence may be suspect. She will stretch the truth to satisfy a department." The consensus of her supervisors from her evaluations and incident reports is that she suffered from mental imbalance.

The state trial court found Yezzo's personnel file, and the lack of its disclosure to the defense, compelling. In that court's judgment, the failure to disclose this impeachment evidence deprived Jim of a fair trial because the information "casts grave doubts about [Yezzo's] credibility," and her testimony was "important and significant in . . . securing a conviction." So it granted him a new trial and released him from prison. The court specifically stated, however, that its "award of a new trial is not a declaration of the Defendant's innocence."

Before he could be tried again, James Parsons died. The case against him was dismissed in an order that states in relevant part: "cause before court sua sponte; court finds that [defendant] is now deceased, that this case is closed[.]"

E.

Debra O'Donnell and Sherry Parsons filed this action against White, the City of Norwalk, Yezzo, and Yezzo's supervisors Dan Cappy and John Lenhart. Plaintiffs brought the following claims: (1) withholding exculpatory evidence and falsifying evidence against all defendants under 42 U.S.C. § 1983; (2) malicious prosecution against Yezzo, Cappy, and Lenhart; (3) intentional infliction of emotional distress against White; (4) wrongful death against White; (5) loss of consortium against White and the City of Norwalk; and (6) negligent infliction of emotional distress against White. The district court ultimately granted judgment to all defendants, and thrice denied requests to compel production of the grand jury materials.[2] Plaintiffs timely appealed.

II.

Plaintiffs first argue that the district court erred when it granted defendants' motion to dismiss the malicious prosecution claim. We review the district court's ruling on a 12(b)(6) motion de novo. *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 275 (6th Cir. 2019). Accepting all allegations in the complaint as true, and drawing all reasonable inferences in plaintiffs' favor, we must determine whether the complaint plausibly states a claim for relief. *Id.* at 276.

---

[2]The parties refer to the documents plaintiffs seek as a "grand jury transcript," but it does not appear that an actual transcript exists. In 2018, the Huron County Court of Common Pleas informed plaintiffs that the grand jury proceedings were not transcribed, but the stenographer's notes still exist. Plaintiffs continue to seek production of these notes and/or a transcript, but it seems that production of a transcript is now impossible. Despite the parties' continued references to the "grand jury transcript," we refer to the documents sought as the "grand jury materials," as the district court did.

To bring a claim for malicious prosecution, a plaintiff must show: "(1) that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding resolved in the plaintiff's favor." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (internal quotation marks and alterations omitted). Only the fourth element—whether there was a "favorable-termination"— is at issue in this appeal.

"[R]ooted in pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments," the favorable-termination element requires that a § 1983 plaintiff "prove that his conviction had been invalidated in some way." *McDonough v. Smith*, 139 S. Ct. 2149, 2157 (2019). When the district court ruled on defendants' motion to dismiss, there was little guiding caselaw regarding what types of prosecutorial actions or events would "invalidate" a conviction. The district court relied on other circuits' precedent to conclude that plaintiffs had to show that Jim was somehow relieved "of the potential jeopardy of a retrial and conviction." Because the succinct dismissal did not do so on its own, the district court concluded that there was "no conclusively favorable outcome," and granted defendants' motion to dismiss the malicious prosecution claims.

Since the district court's ruling, we have stated that there are two ways to show that a conviction had been invalidated: a plaintiff must demonstrate either that the "dismissal indicates that he may be innocent of the charges," or that a conviction has become "improbable." *Jones v. Clark County*, 959 F.3d 748, 765 (6th Cir. 2020) (brackets and citations omitted).

Plaintiffs take the second route.[3] They argue that a conviction against Jim is not only "improbable," it is impossible given Jim's death. This argument is rooted in the innocent-until-proven-guilty cornerstone of American criminal law: in plaintiffs' eyes, we must view Jim as innocent because he has not been found guilty, and now he never can be. Thus, in their view, the termination was sufficiently favorable to sustain their malicious prosecution claim, and the district court erred in dismissing it. We cannot agree because this reading of the word "improbable" is inconsistent with our decision in *Jones*, where we held that "the termination of the proceedings must go to the merits of the accused's professed innocence for the dismissal to be 'favorable' to him." *Id.* at 763 (internal quotation marks omitted).

There, David Jones was indicted on one child-pornography charge after police suspected he used a file-sharing network to view child pornography. *Id.* at 752-53. During the ensuing investigation, the evidence collapsed: a forensics expert concluded that there was no evidence that Jones had ever used the network, and there was no evidence of child pornography on any of his devices. *Id.* at 754. The charges against Jones were dismissed without prejudice, and Jones filed a § 1983 lawsuit alleging, among other things, that defendants engaged in a malicious prosecution against him. *Id.* at 755. We held that Jones had established a sufficient factual dispute to overcome summary judgment because the charges against him were dismissed when the prosecutors determined they had "no evidence connecting him to the illegal video." *Id.* at 765. There was a question of fact as to whether dismissal was indicative of Jones' innocence or a conviction was "improbable," so the favorable-termination issue survived summary judgment. *Id.* Put differently,

---

[3]We note that plaintiffs make an "indication of innocence" argument in their reply brief, arguing that the case against Jim is so weak now that the dismissal indicates he may have been innocent. But this argument, having not been raised below or in their opening brief, is forfeited, so we decline to review it. *See Bormuth v. Cnty. of Jackson*, 870 F.3d 494, 500 (6th Cir. 2017) (en banc).

the prosecutor concluded that a future conviction was improbable based on a lack of evidence of Jones's guilt; thus, the dismissal went "to the merits of [Jones's] professed innocence." *Id.* at 763 (internal quotation marks omitted).

That is not what we have here. Jim died, and the charges against him were dismissed *only* because the prosecutors could no longer bring him to trial. Under our case law, the impossibility of trial that results from a defendant's death is not a sufficiently favorable termination to sustain a malicious prosecution claim because it does not "go to the merits of the accused's professed innocence." *Id.* (internal quotation marks omitted); *see* Restatement (Second) of Torts § 661, Comment (a). Therefore, plaintiffs' malicious prosecution claim is untenable, and the district court properly dismissed it. While this is not the logic the district court employed, we may nonetheless affirm. *See Smith v. Ohio Dep't of Rehab. and Corrs.*, 463 F.3d 426, 436 (6th Cir. 2006).

III.

The district court granted qualified immunity to Yezzo, Cappy, and Lenhart at the motion-to-dismiss stage. Plaintiffs appeal the grant of qualified immunity, which we review de novo. *Shanaberg v. Licking Cnty.*, 936 F.3d 453, 455 (6th Cir. 2019).

Public officials are entitled to qualified immunity, which shields them from personal liability under § 1983, unless they "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether defendants are entitled to qualified immunity, the court must ask two questions: (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted). We may consider these questions in either order. *Id.* at 236.

A.

Plaintiffs brought two claims against Yezzo: that she fabricated evidence and that she failed to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963).

1.

The basis of a fabrication-of-evidence claim is an allegation that a defendant "knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that false evidence could have affected the judgment of the jury." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997). Yezzo concedes that it has long been clearly established that "knowing fabrication of evidence violates constitutional rights." *Mills*, 869 F.3d at 486. Thus, the only issue before the district court and on appeal is whether the allegations contained in the complaint make out a violation of this constitutional right. They do.

The familiar Rule 12(b)(6) standard applies here: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a complaint, we must accept plaintiffs' "well-plead factual allegations as true and construe the complaint in the light most favorable to [them]." *Stimmel v. Sessions*, 879 F.3d 198, 202 (6th Cir. 2018). But we need not accept any legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

Plaintiffs' complaint alleges that, although the Craftsman logo on the breaker bar was recessed, Yezzo testified that she was able to see on the bedsheet a mirror image of the letters "N" and "S" from the breaker bar. Taking the complaint as true, this is impossible (as documented by the reports of the two individuals secured by OIP who evaluated the evidence, Phil Locke and Paulette Sutton.) If the letters were recessed into the breaker bar and a bloody breaker bar hit the

bedsheet, the letters would appear as white spots in a stain of blood, rather than as bloodstains themselves. They would appear as bloodstains themselves only if the Craftsman logo was protruding from the breaker bar—but it was not. Thus, a reasonable logical inference is that Yezzo fabricated the "N" and "S" results.

This is supported by allegations in the complaint that Yezzo never photographed and could not reproduce her findings, indicating that perhaps her findings were fabricated in the first instance. Indeed, Yezzo claimed to be able to link the "unique end of the breaker bar" to the bloodstains on the bedsheet, but she did not photograph that "unique" marker. All these facts support the complaint's ultimate conclusion: Yezzo falsified the "N" and "S" visualization. The district court dismissed this as a legal allegation, but even so, it is supported by sufficient factual allegations to place Yezzo on notice of the claims against her. And the complaint's allegations that "Yezzo was known for asking law enforcement 'what they needed the evidence to say,'" and that she "had a reputation of giving law enforcement the answers they wanted if they 'stroked her ego'" support the conclusion that Yezzo acted knowingly. Plaintiffs have adequately pled a fabrication of evidence claim against Yezzo, and she is not entitled to qualified immunity. Accordingly, we reverse that portion of the district court's judgment. And because we find that the complaint adequately states a fabrication-of-evidence claim against Yezzo as filed, we need not address plaintiffs' appeal of the district court's order denying their motion to amend the complaint to bolster this claim.

2.

The complaint also alleged that Yezzo failed to disclose exculpatory impeachment evidence—her personnel file—to the prosecution and the defense. The district court did not address this claim against Yezzo, but the district court concluded that Yezzo was entitled to

qualified immunity when it granted her motion to dismiss. Because we are "a court of review, not first view," *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015), we vacate the district court's grant of qualified immunity to Yezzo and remand for consideration of the *Brady* claim against her in the first instance. *See also Child Evangelism Fellowship of Ohio, Inc. v. Cleveland Metro. Sch. Dist.*, 600 F. App'x 448, 453 (6th Cir. 2015) ("We generally do not consider issues left unaddressed by the district court.").

B.

Plaintiffs also brought two claims against Cappy and Lenhart in their capacity as Yezzo's supervisors: the same *Brady* claim and a failure-to-supervise claim. The district court granted them qualified immunity on both. Plaintiffs appeal only the failure-to-supervise claim. As above, we review the grant of qualified immunity de novo. *Shanaberg*, 936 F.3d at 455.

To successfully plead a supervisory liability claim, plaintiffs must show that the supervisor "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021) (citation omitted). They must plausibly allege that the supervisor did so "through the execution of his job functions." *Id.* (citation omitted). And they must do more than allege mere knowledge of unconstitutional conduct, *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999), because supervisory liability "will not attach for a mere failure to act," *Crawford*, 15 F.4th at 761 (internal quotation marks omitted).

The complaint generically alleges that Cappy and Lenhart knew Yezzo "was stretching the truth to satisfy law enforcement," "knew how important the scientific evidentiary results coming from [the] BCI laboratory were to establishing probable cause and securing convictions," and "permitted Defendant Yezzo to continue producing evidentiary reports without adequate

supervision and without verifying whether her results were true." Plaintiffs' complaint asserts only that they knew about Yezzo's history of misconduct yet allowed her to continue to evaluate evidence, and it contains no allegation that Cappy and Lenhart acted. This is insufficient. Knowledge, with nothing else, indicates a failure to act rather than active unconstitutional behavior, and that is insufficient to sustain plaintiffs' claim against them. *Crawford*, 15 F.4th at 761. Accordingly, the district court properly granted Cappy and Lenhart qualified immunity. We affirm this portion of the district court's judgment.

IV.

Next, plaintiffs appeal the district court's orders denying their requests to compel production of the grand jury materials. This issue has a lengthy history. Plaintiffs' first motion to compel sought the grand jury materials to determine if White and/or Yezzo falsely testified or procured false testimony from other witnesses to obtain an indictment against Jim. The district court denied that motion after it dismissed the malicious prosecution claim and all claims against Yezzo because, at that point, it found no particularized need for the materials for any claim still pending. The district court reasoned that plaintiffs could depose White, so they may not need the grand jury materials. Plaintiffs moved for reconsideration, which the district court denied, emphasizing that plaintiffs should depose White and Yezzo before seeking production of these materials. Plaintiffs did so, but neither witness was able to testify in any detail about the grand jury proceedings that occurred some twenty-five years ago. While discovery was ongoing, plaintiffs learned that the City of Norwalk had a copy of the grand jury materials and that the City's attorney (who is also White's attorney) had reviewed them, so plaintiffs filed a second motion to compel. Defendants did not object to this motion, but the Huron County Court of Common Pleas did. Before the district court ruled on this motion, the defendants returned the grand jury materials

to the Huron County Court of Common Pleas. This time, the district court reviewed the grand jury materials in camera (by agreement of all counsel), found that there was nothing in those materials that was "inconsistent with, or more elaborate than" the witnesses' trial testimony, and denied the motion to compel. Plaintiffs now ask this court to reverse all three of the district court's rulings.

"We review the denial of a motion to compel production, as an evidentiary matter within the trial court's discretion, for an abuse of discretion." *United States v. Blood*, 435 F.3d 612, 627 (6th Cir. 2006). "An abuse of discretion occurs when we are left with the definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached up on a weighing of the relevant facts or where it improperly applies the law or uses an erroneous legal standard." *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002) (internal quotation marks and alterations omitted).

The district court's orders contained no abuse of discretion. In all three motions, the plaintiffs requested that the Huron County Court of Common Pleas (a state court) produce the grand jury materials. But plaintiffs have identified no controlling case in which a *federal* court has compelled a *state* court to produce grand jury materials over the state court's objection, likely because of the "longstanding public policy against federal court interference with state court proceedings." *Younger v. Harris*, 401 U.S. 37, 43 (1971). The district court did not abuse its discretion when it denied plaintiffs' requests to compel the grand jury materials. Accordingly, this portion of the district court's judgment is affirmed.

V.

At the summary judgment stage, the district court ruled that plaintiffs failed to present evidence that White fabricated evidence or violated Jim's *Brady* rights. Plaintiffs challenge these findings on appeal. We review the district court's summary judgment rulings de novo. *Wilmington*

*Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017). "Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted).

A.

To establish a fabrication-of-evidence claim, plaintiffs must show that White "knowingly fabricated evidence against [Jim], and [that] there is a reasonable likelihood that false evidence could have affected the judgment of the jury." *Stemler*, 126 F.3d at 872. Plaintiffs have two theories: that White intentionally provided the wrong breaker bar to Yezzo and that he went "lab shopping" to secure an expert witness that was willing to give the testimony he was looking for. The district court concluded that plaintiffs had not established a genuine issue of material fact on either theory. We agree.

1.

Plaintiffs first argue that White knowingly provided the wrong breaker bar to Yezzo for testing. They support this claim with only conjecture and speculation, which is insufficient to withstand summary judgment.

Plaintiffs begin with White's 2020 deposition testimony that when he retrieved the Burras bar from the evidence room in 1990 or 1991, it was the only breaker bar in the evidence room. This is irreconcilable, plaintiffs argue, with a photo of the evidence room (taken in 2020) that shows four breaker bars present in the evidence room. The inference plaintiffs ask the court to draw is that White lied. It is unclear why there was only one breaker bar in the evidence room when White began his investigation—recall that Norfolk Police recovered three bars during their

1981 investigation.[4] But, as the district court recognized, this fact does not give rise to a reasonable inference that White lied, because at trial, the defense introduced three additional, similar Craftsman breaker bars into evidence. The Burras bar and the three defense bars makes four, so it is logical that there were four breaker bars in the evidence room in 2020. White's statement that there was only one breaker bar in the evidence room before the 1993 trial does not indicate that he lied or that he knowingly fabricated evidence.

Plaintiffs also note that the Burras bar's chain of custody does not begin until September 17, 1992, but it had been recovered from Burras in 1981. Plaintiffs argue that White knew the bar could not actually be traced to Burras, given the eleven-year gap in the chain of custody. But this argument ignores White's testimony: when he reopened this case, he found the Burras bar in an evidence bag with both bag and bar marked with the initials of the police officers who had obtained the bar from Burras in 1981. Plaintiffs make much of the fact that White did not retain the original evidence bag, but he testified that he threw away the original brown paper bag because it had "deteriorated to the point where it was no longer usable." The bar was still marked with the original officers' initials, and the bag itself is not evidence. While the chain of custody begins when White reopened the investigation, White understood the only bar in evidence to be the Burras bar based on the bag and bar's labeling. The assumption that plaintiffs ask the court to draw—that White had no idea where this bar came from, and that he decided to call a random bar the Burras bar to pin the murder on Jim via Burras—is completely unsupported.

---

[4]The district court hypothesized that officers disposed of the other two bars because there was no evidence connecting them to Barbara's murder. However, there is no record evidence to support this hypothesis, so we decline to make the same assumption. All the record shows is that there was one breaker bar in the evidence room when White began to investigate.

Finally, plaintiffs rely upon a 1996 affidavit from Burras, in which he stated that the breaker bar presented at trial was not the one he had given police, and his corresponding trial testimony. However, this does not establish that White knowingly lied when he submitted the breaker bar to Yezzo, because White had the bar tested in 1992. Burras testified about the discrepancy in 1993 and swore out the affidavit in 1996, both long after White submitted the bar for testing. There is no evidence in the record that shows that in 1992, White knew that Burras believed the bar found in the evidence room was not actually the bar recovered from his car.

Beyond plaintiffs' conjecture, there is no evidence that White knowingly supplied Yezzo with a breaker bar that was not the Burras bar and later called it the Burras bar to inculpate Jim in Barbara's murder. Thus, we affirm the district court's grant of summary judgment in favor of White on plaintiffs' fabrication of evidence claim based on the breaker bar.

2.

Next, plaintiffs assert that White improperly engaged in "lab shopping" to fabricate the evidence he needed to convict Jim, arguing that White took the evidence to forensic experts until he landed on one who had a habit of stretching the truth. But plaintiffs failed to support that allegation with sufficient evidence.

White first took the Burras bar and the bedsheet to the Cuyahoga County Coroner's Office for examination; those results were neither exculpatory nor inculpatory. He then sought out Hale, who did not review the physical evidence. White next took the evidence to Dr. Lee, a world-renowned blood-spatter expert, who declined to become involved. Nothing about these three contacts show "lab shopping." White first got an inconclusive answer from the coroner, and neither Hale nor Dr. Lee reviewed the actual evidence. It is not suggestive that White continued to seek a second opinion after one inconclusive opinion and two non-opinions.

Finally, the Huron County Prosecutor suggested taking the evidence to the BCI, where Hale connected White with Yezzo. White testified that at the time, he believed Yezzo to be the best in her field, and Yezzo testified that Hale approached her directly on White's behalf. At the time, Yezzo was the BCI's blood-spatter expert. This discounts plaintiffs' argument that Yezzo's intentional selection for this case (rather than random placement) indicates that something was amiss. Indeed, White testified that he had not met Yezzo before that meeting, and Yezzo testified that she had not met White. White testified that he thought Yezzo had an outstanding reputation, and there is simply no evidence that White sought out Yezzo because of her reputation for stretching the truth. While Yezzo's analysis was ultimately suspect, there is no evidence that White knew *in advance* that her analysis would be suspect.

Plaintiffs have not established a genuine issue of material fact sufficient to overcome summary judgment on their fabrication-of-evidence claim against White. Accordingly, the district court properly granted summary judgment in favor of White on this claim.

B.

In the district court, plaintiffs also claimed that White violated his *Brady* obligations by failing to disclose both Yezzo's suspension and her personnel file. Plaintiffs raise only the suspension issue on appeal.

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence that a government witness is suspended pending an investigation into misconduct can be impeachment evidence. *See, e.g.*, *United States v. McClellon*, 260 F. Supp. 3d 880, 885 (E.D. Mich. 2017). And police officers have

a duty to disclose *Brady* evidence to prosecutors. *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014).

Plaintiffs' argument has two fatal flaws. First, White learned of Yezzo's suspension *from* the prosecutor, so there was no further *Brady* evidence for him to disclose to the prosecutor. And second, the duty to disclose to the defense ultimately lies with the prosecutor. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *D'Ambrosio*, 747 F.3d at 389. To the extent that plaintiffs claim that the defense should have learned that Yezzo was suspended before trial, that claim cannot be brought against White. White did not violate any *Brady* obligation.

To avoid this conclusion, plaintiffs make much of testimony at Jim's post-conviction hearing that the prosecutor asked White if Yezzo's suspension would have an impact on her work, and White said it would not. But all White knew at that point was that Yezzo was suspended for conflicts with coworkers and threatening violence. There is no evidence that he would have known or suspected that this impacted the quality of Yezzo's scientific work. Thus, his statement to the prosecutor does not evidence bad faith or any failure to disclose.

As with the fabrication-of-evidence claim, plaintiffs' claim here rests on speculation. The district court properly concluded that plaintiffs have not shown the existence of a genuine issue of material fact sufficient to withstand summary judgment. We affirm.

VI.

Plaintiffs brought a municipal liability claim against the City of Norwalk based on defendant White's misconduct. Plaintiffs argue that the City of Norwalk is liable for its failure to train and supervise, and for White's status as a final policymaker. The district court granted summary judgment in favor of the City of Norwalk because it found that White did not violate any

of Jim's constitutional rights. We agree, because here there can be no municipal liability absent a showing of an individual constitutional violation. *D'Ambrosio*, 747 F.3d at 391.

## VII.

The final issue on appeal is whether the district court erred in granting summary judgment in favor of White without addressing plaintiffs' state law claims. In its summary judgment opinion, the district court addressed the federal claims against White and then entered judgment in his favor, but the court did not address plaintiffs' outstanding claims under Ohio law (intentional infliction of emotional distress, wrongful death, and loss of consortium). As noted above, we are "a court of review, not first view." *Houston*, 792 F.3d at 669. The district court never considered these claims, so we decline to review them in the first instance. *See Child Evangelism Fellowship*, 600 F. App'x at 415. We therefore vacate the district court's grant of summary judgment to White and remand to the district court for consideration of the state-law claims. Of course, the district court remains free to assess its exercise of supplemental jurisdiction on remand. *See* 28 U.S.C. § 1367(c).

## VIII.

For these reasons, we affirm the district court's dismissal of plaintiffs' malicious prosecution claims against all defendants; grant of qualified immunity to Cappy and Lenhart; orders denying plaintiffs' motions to compel the grand jury materials; grant of summary judgment in favor of White on the federal claims against him; and grant of summary judgment in favor of the City of Norwalk. We reverse the district court's grant of qualified immunity to Yezzo on the fabrication-of-evidence claim against her. And we vacate the district court's dismissal of the *Brady* claim against Yezzo and grant of summary judgment in favor of White on the state-law claims against him.

In sum, all that remains are the fabrication-of-evidence and *Brady* claims against Yezzo and the three state-law claims against White. Accordingly, we affirm in part, reverse in part, and vacate in part the district court's judgment, and remand for further proceedings consistent with this opinion.